Joseph A. **CRENSHAW** et al.

v.

**ALLIED CHEMICAL CORP.** et al.

Civ. A. No. 74–0060–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Jan. 16, 1975.

JeRoyd X. Greene, Richmond, Va., for plaintiffs.

Hill B. Wellford, Jr., Richmond, Va., Jay J. Levit, Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, former employees of Allied Chemical Corporation ("Allied"), bring this purported class action against Allied and Local 101, Industrial and Allied Workers ("Local 101"), alleging (1) that they were wrongly discharged by Allied for participating in a work stoppage at Allied's Chesterfield, Virginia plant located within this Judicial District, and (2) that Local 101 breached its duty of fair representation by con-

spiring with Allied to let their "discharges stand", and, then, only lackadaisically pressing their claims through the contract grievance procedure, and, finally, refusing to arbitrate their dispute with Allied. Plaintiffs now seek reinstatement and monetary relief. Jurisdiction over plaintiffs' wrongful discharge action against Allied is conferred by § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185. Plaintiffs' breach of fair representation action arises under § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a) and jurisdiction is conferred by 28 U.S.C. §§ 1331(a) and 1337. This matter comes before the Court on defendant Local 101's motion to dismiss, accompanied by exhibits, and defendant Allied's motion to dismiss, accompanied by an affidavit; both motions are addressed by the Court as ones for summary judgment.

## I.  STATEMENT OF FACTS

The Court has culled the following facts from the pleadings, affidavits, and other papers: Allied, a New York corporation, operates a plant in Chesterfield County, Virginia, where it manufactures chemicals which move in interstate commerce. Local 101, which is affiliated with the Teamsters Union, represents a bargaining unit comprised of hourly paid production and maintenance workers located at Allied's Chesterfield plant. In March, 1972, Allied and Local 101 entered into a collective bargaining agreement covering employees in Local 101's bargaining unit, which provided for wage increases in March 1972, March 1973, and March 1974. The agreement also permitted Allied to unilaterally change wage rates where a new job was created or where the responsibilities in an existing job were changed substantially.

Despite the terms of the agreement, Local 101 in August, 1973, requested a wage increase for all employees which Allied refused to grant. Contemporaneously with its decision to deny the

wage increase, Allied notified Local 101 of its intention to establish a new maintenance worker classification at a higher rate of pay and subsequently increased the wages of certain maintenance craftsmen. Plaintiffs contend that this wage increase violated terms of the contract because no reclassification or substantial job change had occurred.

Plaintiffs allege that on or about September 6, 1973, Local 101 informed its membership of Allied's dual decision to reject a general wage increase and increase the wages of certain maintenance craftsmen. Local 101's secretary-treasurer, plaintiffs assert, informed certain employees that the selective wage increases breached the collective bargaining agreement and exhorted them to form a picket line. Certain employees then set up such a line and a work stoppage ensued. Two days later the Circuit Court of Chesterfield County, Virginia, granted Allied a temporary restraining order which forbade the plaintiffs and other hourly employees from further violating the bargaining agreement's no-strike provision and proscribed further picketing, or other action which would have the effect of preventing employees from working.

Local 101 disputes that it sought to induce its membership to engage in a work stoppage. It contends that it informed its membership by bulletin that it was filing an unfair labor practice charge with the National Labor Relations Board to challenge the selective pay increase and that they were to stay on the job while the issue was being litigated. During the work stoppage, Local 101 provided neither financial assistance to striking employees nor legal assistance to defendants in the action before the Circuit Court of Chesterfield County.

On or about September 18, 1973, Allied indefinitely suspended plaintiffs from employment for participating in the work stoppage. In October, 1973, Local 101 filed an unfair labor practice charge alleging that Allied had given selective wage increases to the maintenance craftsmen in order to discourage other employees from engaging in legitimate union activity.[1] On the 25th of October, the Regional Director of the National Labor Relations Board notified Local 101 that no complaint would be issued against Allied as a result of Local 101's selective discrimination charge. Local 101 appealed to the General Counsel of the National Labor Relations Board who, in turn, denied the appeal on November 13, 1973.

At the same time that the union was filing its unfair labor practice charge with the NLRB, the plaintiffs, attacking their discharges and seeking reinstatement, filed grievances with Allied. When Allied refused to grant the requested relief at Step 3 of the grievance procedure, plaintiffs requested their union to submit the discharge issue to arbitration. Although, as plaintiffs allege, the union's attorney was reluctant to initiate arbitration, Local 101, nevertheless, requested a date for arbitration. An arbitration hearing at which plaintiffs were represented by union counsel[2] was held on February 25, 1974. The arbitrator found that Allied had acted well within its legitimate managerial prerogatives in selectively reclassifying certain employees, and had neither committed an unfair labor practice nor acted in a manner calculated to discourage unionism. The arbitrator concluded that the plaintiffs had participated in an illegal walkout in violation of Article 31 of the Collective Bargaining Agreement; that the Union, contra to plaintiffs' asser-

---

1. Plaintiffs contend, however, that the unfair labor practice charge was filed in bad faith in order to give plaintiffs the false impression that a sincere effort was being made in their behalf.

2. Plaintiffs were notified by Local 101 of their right to retain private counsel at their

own expense to represent them at the arbitration hearing. Letter from J. David Whitely, President of Local 101, February 15, 1974.

tions, had "advised, urged, and pleaded with the employees to stay on the job;"[3] and that Allied had acted legally in terminating the plaintiffs' employment.[4]

## II. CONCLUSIONS OF LAW

### A. Plaintiffs' Standing to Institute a § 301 Action.

■■■ Plaintiffs have brought an action against Allied alleging that they were wrongfully discharged and seeking reinstatement with back pay. A preliminary question is that of plaintiffs' standing to bring this § 301 action in federal court. Section 301 of the Labor-Management Relations Act, 29 U.S. C. § 185(a), reads:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

The parties to the collective bargaining agreement, which is a set of rules defining and regulating the work relationship, are the union and the employer. Generally, then, only the union and the employer, as parties to the agreement, have standing to seek its enforcement and remedy its breach. Although courts have usually not troubled to enunciate a theory upon which employees may be permitted to institute § 301 suits, it seems clear that standing should be premised upon a third party beneficiary theory. The union concludes the contract for the benefit of the employees that it represents so that when the union fails in its duty to provide represen-

tation, the represented should be able to appeal to the courts for relief. See Cox, Rights Under a Labor Agreement, 69 Harv.L.Rev. 601, 645–46 (1956). Therefore, the employee may acquire standing to launch a § 301 suit against the employer when he or she alleges that the union has breached its duty of fair representation by refusing to fairly, impartially, or honestly represent an employee's interests in a collective bargaining agreement dispute resolution proceeding. See Humphrey v. Moore, 375 U.S. 335, 342–345, 84 S.Ct. 363, 11 L. Ed.2d 370 (1964); see also Feller, A General Theory of the Collective Bargaining Agreement, 61 Cal.L.Rev. 663, 695 (1973)(". . . [T]he significant holding of Humphrey v. Moore was that an individual could maintain an action to enforce its rights under a collective bargaining agreement.")

### B. The Union's Duty of Fair Representation

Before reviewing at defendants' behest the procedural adequacy of plaintiffs' claims, the Court deems it appropriate to first sketch the content of the union's duty of fair representation.

■■■ Congress has given unions wide authority and great discretion to reconcile the competing interests of the employees whom they represent so that they might speak with one voice when they confront management at the bargaining table. The congressional policy favoring collective action through the union over piecemeal action by individuals represents a calculation that in a business world populated by powerful corporations the individual employee lacks the economic power to strike an advantageous employment bargain, and that the individual's economic interest is, therefore, best served by collective action. NLRB v. Allis-Chalmers, 388

---

3. See, e. g., Joseph Crenshaw Grievance, at 10 (May 21, 1974) (Daly, Arbitrator).

4. Defendant Allied contends that this action should be dismissed because plaintiffs have not exhausted their contract remedies. Republic Steel v. Maddox, 379 U.S. 650, 85 S.

Ct. 614, 13 L.Ed.2d 580 (1965). Since plaintiffs' wrongful discharge issue has been pressed, albeit allegedly perfunctorily, through the contract grievance mechanism and has been decided by the arbitrator, plaintiffs have complied with the exhaustion requirement.

U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). Congressional validation of collective action, however, necessarily involves extinguishing many of the contract and economic rights belonging to union members and, instead, vesting the power to act in their behalf with their chosen representative, the union. This new relationship between union and employee has been succinctly described by the Fifth Circuit:

> The employee has gained bargaining strength through representation by his union but has surrendered his right to make "the law of the Job", and his interests are subordinated to those of the bargaining unit as a whole. Thus, in its role as the exclusive agent for all employees in the bargaining unit, the union has the power to sift out frivolous grievances, to abandon processing of grievance which it determines in good faith to be meritless, and to settle disputes with the employer short of arbitration. Harris v. Chemical Leaman Tank Lines, Inc., 437 F.2d 167, 171 (5th Cir. 1971).

■ The union exercises legislative power when it attempts to harmonize the many competing interests of its membership so that it may face management with a single voice. *See* Steele v. Louisville & Nashville R. R., 323 U.S. 192, 202, 65 S.Ct. 226, 89 L.Ed. 173 (1944). In negotiating an economic package, the union must necessarily favor the interests of some employees over other employees just as a legislature in arriving at the public interest must favor some sectional and special interests over others. Likewise, the Court has reviewed union decisions respecting the welfare of the employees represented with the same deference traditionally accorded legislative judgments. NLRB v. Allis-Chalmers, 388 U.S. 175, 180–181, 87 S.Ct. 2001, 18 L.Ed.2d 1123. As the Court said in Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953):

> The complete satisfaction of all who are to be represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

■ Although the Court has determined that implementation of our national labor policy requires that unions be given great latitude, "the Supreme Court did not invest the union with a carte blanche." Griffin v. U. A. W., 469 F.2d 181, 183 (4th Cir. 1972). The Supreme Court has recognized the reality that such great power, if left completely unchecked, can be the instrument for arbitrary and capricious infringement of the rights of individual employees. The Court has therefore created a doctrine, the duty of fair representation, which subjects the union to an obligation to deal rationally, fairly, and honestly with the employees it represents. Steele v. Louisville & Nashville R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) (duty implied from Railway Labor Act); Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) (duty of fair representation implied from National Labor Relations Act). This obligation has been made enforceable by giving the individual employee a right of action against the union which abuses its collective authority by acting arbitrarily or discriminatorily toward individual employees.

■ Even though recognizing that the duty of fair representation "is a legal term of art, incapable of precise definition," *id.* at 182, Judge Sobeloff, writing for a unanimous Fourth Circuit in Griffin v. U. A. W., 469 F.2d 181, has identified three separate restraints which the duty imposes upon union action:

> First, it must treat all factions and segments of its membership without hostility or discrimination. Next, the broad discretion of the union in asserting the rights of its individual members must be exercised in com-

plete good faith and honesty. Finally, the union must avoid arbitrary conduct. Each of these requirements represents a distinct and separate obligation, the breach of which may constitute the basis for civil action. *Id.* at 183.

Therefore, in order to make out a judicially cognizable claim for breach of the union's duty of fair representation, an employee must allege conduct on the union's part which is arbitrary, discriminatory, or done in bad faith. Vaca v. Sipes, 386 U.S. 171, 193, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

■ Vaca v. Sipes and Griffin v. U. A. W., which relied on *Vaca*, involved situations where it was alleged that the union arbitrarily refused to process a meritorious grievance or take a dispute to arbitration. "The repeated references in *Vaca* to 'arbitrary' union conduct reflected a calculated broadening of the fair representation standard [citations omitted]." Griffin v. U. A. W., 469 F.2d 181, at 183. The duty of fair representation standard was therefore broadened in the context of a union's duty to process grievances and submit to arbitration disputes between employer and employee.

C.  The Effect of the Conclusion of Arbitration Proceedings Upon Plaintiffs' Ability to Maintain this Action.

■■ Plaintiffs' original complaint, filed December 31, 1973, alleged that Local 101 had breached its duty of fair representation by only perfunctorily pressing their claim through the grievance procedures and refusing in bad faith to demand arbitration. Plaintiffs' amended complaint, filed January 31, 1974, added the further allegation that Local 101 had acted in bad faith by postponing from January 7, 1974 to February 25, 1974, arbitration hearings on plaintiffs' wrongful discharge claim and had thus denied plaintiffs their right to speedy arbitration of their claims. Up to this point, plaintiffs' complaint stated a well pleaded breach of duty of fair representation claim. A union breaches its duty of fair representation to its employees when it only perfunctorily presses a grievance or refuses in bad faith to take an employee's claim to arbitration.[5] Vaca v. Sipes, 386 U.S. 171, 191, 87 S. Ct. 903, 17 L.Ed.2d 842 (1967); Griffin v. U. A. W., 469 F.2d 181, 183 (4th Cir. 1972); De Arroyo v. Sindicato de Trabajadores Packinghouse, 425 F.2d 281, 284 (1st Cir. 1970).

After the plaintiffs filed their amended complaint, the union took their dispute with Allied to arbitration under date of February 25–26, 1974. Local 101 offered the plaintiffs the opportunity to be represented by counsel of their own choosing at the arbitration proceeding, but plaintiffs indicated on the record at the arbitration hearing that they wished to be represented by defendant Local 101 and its counsel. During the latter part of May, the arbitrator handed down decisions in the cases of each of the plaintiffs. He concluded that: (1) Allied had acted within its contractual prerogatives in ordering the wage in-

5. The plaintiffs also alleged that the union breached its duty of fair representation by "conspir[ing] with defendant company to permit the illegal wage increases to stand and to permit the named plaintiffs' discharges to stand." Complaint, ¶ 7. Lusk v. Eastern Products Corp., 427 F.2d 705 (4th Cir. 1970), requires dismissal of this specific allegation because it is the rule in this Circuit that a duty of fair representation complaint must contain more than bare conclusory allegations of collusion or conspiracy between union and employer; it must contain "supporting facts to show the union's lack of good faith." *Id.* at 708. The *Lusk* "supporting facts" requirement appears superficially inconsistent with the "notice pleading" rule of Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (a duty of fair representation case) and the Supreme Court's admonition that duty of fair representation complaints be construed liberally. Czosek v. O'Mara, 397 U.S. 25, 27, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970). Nevertheless, this Court is bound by the rule of *Lusk* and it shall, accordingly, dismiss this specific allegation without prejudice.

creases for the maintenance craftsmen; (2) that the plaintiffs had struck in violation of the collective bargaining agreement; (3) that the plaintiffs had not been wrongfully discharged; and (4) that the local had vigorously opposed, rather than encouraged, the strike.

▮▮▮ The arbitrator's decision requires dismissal of plaintiffs' duty of fair representation claim at this stage of the litigation and on this state of the pleadings. First, the plaintiffs did not amend their pleadings to attack the quality of the representation at the arbitration proceeding. It may well be that plaintiffs were perfectly satisfied with the quality of their representation at this proceeding so that their duty of fair representation claim has been mooted.

Second, since the plaintiffs do not in their pleadings attack the quality and fairness of their representation at the arbitration hearing, they lack the requisite standing to mount a § 301 attack against Allied in this Court.

Finally, under the collective bargaining agreement, the decisions of the arbitrator are "final and binding" as between the parties. Collective Bargaining Agreement, Art. 7, ¶ 2(c). When the collective bargaining agreement makes arbitration decisions final and binding upon the parties, those decisions are not reviewable by courts of law. White v. Chemical Leaman Tank Lines, 490 F.2d 1267 (4th Cir. 1974); Cf. Truck Drivers Union v. Riss & Co., 372 U.S. 517, 519, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963). The Fourth Circuit recognizes an exception to the principle of non-reviewability of arbitration decisions: where a discharge attacks the fairness of the arbitration decision because the union which had been entrusted with the duty of representing his or her interests at the proceeding allegedly acted in bad faith in conspiring with the employer to secure his or her discharge, then the arbitrator's decision may be reviewed by the courts. Lusk v. Eastern Products Corp., 427 F.2d 705, 708

(1970). Such a proceeding may be attacked in the courts because it "entrust[ed] representation of the complaining employee to the very union which he claims refused him fair representation and because it . . . present[ed] as adversaries in the arbitration proceeding the two parties charged by the employee with combining to defraud him." Id.

Since plaintiffs apparently acquiesced in the union's representation at the arbitration proceeding and have not amended their complaint to allege collusion between employer and union at the proceeding, the arbitrator's conclusion that the plaintiffs were not wrongfully discharged is binding upon the parties.

Summary judgment shall be granted to defendants, and plaintiffs' § 301 claim against Allied and their duty of fair representation claim against Local 101 shall be dismissed without prejudice.