CITY OF FARMINGTON HILLS v FARMINGTON HILLS POLICE
OFFICERS ASSOCIATION

1. CONTRACTS—REFORMATION OF INSTRUMENTS—MUTUAL MISTAKE—
   PRIOR AGREEMENT.
   Reformation of a contract on the ground of mutual mistake is
   allowed where it is shown that the parties execute the instru-
   ment in the mutually mistaken belief that its terms will give
   effect to a valid prior agreement.

2. LABOR RELATIONS—COLLECTIVE BARGAINING AGREEMENTS—RATIFI-
   CATIION VOTE—RANK AND FILE MEMBERS.
   The mere fact that a ratification vote was held by the rank and
   file members of a collective bargaining organization on a col-
   lective bargaining agreement does not imply that such a ratifi-
   cation vote was required to give force to the union's agreement

3. LABOR RELATIONS—FEDERAL CASES—NATIONAL LABOR RELATIONS
   ACT—PUBLIC EMPLOYMENT RELATIONS ACT—STATUTES—STATU-
   TORY CONSTRUCTION.
   Federal cases decided under the National Labor Relations Act
   may be looked to for guidance in construing comparable provi-
   sions of the public employment relations act (MCLA 423.201 *et
   seq.;* MSA 17.455[1] *et seq.).*

4. LABOR RELATIONS—PUBLIC EMPLOYEES—COLLECTIVE BARGAINING
   AGREEMENTS—DESIGNATED REPRESENTATIVE—RATIFICATION—
   PUBLIC EMPLOYMENT RELATIONS ACT—STATUTES.
   Public employees in negotiating a collective bargaining agree-
   ment with their employer through the union's designated rep-
   resentative may reserve by agreement with the employer the
   right of ratification by the rank and file; however, there is

REFERENCES FOR POINTS IN HEADNOTES
[1] 66 Am Jur 2d, Reformation of Instruments § 4.
[2, 4, 5] 48 Am Jur 2d, Labor and Labor Relations § 469.
[3] 48 Am Jur 2d, Labor and Labor Relations §§ 1155, 1443.
   *Validity and construction of statutes or ordinances providing for
   arbitration of labor disputes involving public employees.* 68
   ALR3d 885.
[4] 48 Am Jur 2d, Labor and Labor Relations §§ 1191–1197.

nothing in the public employment relations act which suggests that ratification by the rank and file is required before an agreement reached between the employer and the union's designated representative becomes effective (MCLA 423.201 *et seq.;* MSA 17.455[1] *et seq.).*

5. LABOR RELATIONS—COLLECTIVE BARGAINING AGREEMENT—PRIOR
   AGREEMENT—MUTUAL MISTAKE—RATIFICATION—APPEAL AND
   ERROR.

   A trial court, in a suit for reformation of a collective bargaining agreement, erroneously found that a plaintiff had failed to show a valid prior agreement where (1) the ground for the suit was mutual mistake based on the parties having executed a contract in the mutually mistaken belief that the agreement's terms would give effect to a valid prior agreement, (2) the record does not support a claim that member ratification was required to create the valid prior agreement, and (3) the record does support a claim that the union's negotiator had the authority to enter and did enter a valid prior agreement.

Appeal from Oakland, Robert L. Templin, J. Submitted April 6, 1977, at Lansing. (Docket No. 30309.) Decided November 21, 1977.

Complaint by the City of Farmington Hills against Farmington Hills Police Officers Association for reformation of a collective bargaining agreement. Defendant counterclaimed for specific performance of the agreement. Judgment for defendant. Plaintiff appeals. Reversed and remanded.

*Brennan & Bibeau, P. C.* and *Chirco, Donaldson & Herrington,* for plaintiff.

*Goldberg, Previant & Uelmen, sc* (by *John S. Williamson, Jr.),* for defendant.

Before: BRONSON, P. J., and M. F. CAVANAGH and C. J. BYRNS,* JJ.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

M. F. CAVANAGH, J. Plaintiff sued for reformation of a collective bargaining agreement negotiated under the public employment relations act. MCLA 423.201 *et seq.;* MSA 17.455(1) *et seq.* At the close of plaintiff's proofs the trial judge, sitting without a jury, granted defendant's motion for involuntary dismissal. GCR 1963, 504.2. The court subsequently entered orders dismissing plaintiff's claim and granting defendant judgment on its counterclaim for specific performance of the collective bargaining agreement. Plaintiff takes this appeal by right.

On April 12th, 1972, at the last formal session for negotiation of the collective bargaining agreement, the negotiators for the two sides agreed on a formula for a cost of living allowance (COLA). The collective bargaining agreement was subsequently drafted in final form, and executed by agents of the employer and the designated representative.

The agreement as negotiated at the bargaining table anticipated periodic readjustments in wages to reflect increases in the cost of living. The first adjustment was to be made 12 months into the agreement, with readjustments every 6 months thereafter. Increases were to be pegged to changes in the Detroit Consumer Price Index. The formula for translating increases on the index to increases in pay was simple, and designed to track closely the actual increase in the cost of living. At the first adjustment period (12 months) the increase in the index (measured in points) is calculated. This simply required subtracting the index on the date the agreement was executed from the index on the date of adjustment. From the remainder is subtracted an agreed upon "absorption factor" of 2.5 points. Assuming that the index increased more than 2.5 points, this left an adjusted index in-

crease. For each point of such increase, the employee's wages would be increased by one percent.

At the next adjustment period (18 months), a new COLA would be computed. The index increase *since the last adjustment* is calculated. Then an absorption factor (now 1.25) is subtracted. The remainder, in percentage points, is the employee's COLA. This percentage increase is multiplied times current wages to yield the employee's raise, in dollars.

This process was to be repeated at six month intervals for the duration of the contract. This formula could be summarized in the following terms: index increase since last adjustment, minus absorption factor, equals COLA, in percentage points, multiplied times current wages, equals raise, in dollars.

The employer's chief negotiator drafted the collective bargaining agreement's COLA provision. Several months after the contract was executed, he discovered that the provision was not functioning as he had intended, and was instead producing cost of living "allowances" out of all proportion to increases in the Consumer Price Index. Careful analysis of the language of the contract's COLA provision demonstrates why.

Under the language of the collective bargaining agreement, the first COLA is calculated as provided by the bargaining table formula. However[9], the process differs at the second adjustment, and at each adjustment thereafter. Under the collective bargaining agreement formula, the index increase is figured by subtracting the index at the date of execution from the index at the date of readjustment. Then the absorption factor for this adjustment period and for each previous period is subtracted. The remainder, in percentage points, is

the employee's COLA. This allowance is multiplied times current wages to give the raise, as under the previous formula. This process is repeated every six months thereafter. The contract formula may be summarized as follows: new index, minus *original* index, minus total of all absorption factors, equals COLA, in percentage points, multiplied times current wages, equals raise, in dollars.

The reader will observe that the contract formula results in a compounding of cost of living increases. This is not due solely to the method of calculating the index increase. There is nothing inherently misguided about going back to the original index, and calculating the overall increase (less overall absorption factors) in order to arrive at the current COLA, in percentage points. The difficulty arises when this overall increase is multiplied times *current wages.* Those wages represent the sum of the base wage plus all previous COLAs, in dollars. Thus, current wages already reflect part of the overall increase in the cost of living. By readjusting current wages on the basis of the total increase, since the date of execution, the previous COLAs built into those wages are compounded.

The difference in the outcomes under the two formulae is striking. As applied to the index increases experienced during the life of this collective bargaining agreement, they yield the following disparate results:

|  | NEGOTIATED COLA | COLLECTIVE BARGAINING AGREEMENT COLA |
|---|---|---|
| 12 months | 2.30% | 2.30% |
| 18 months | 5.85% | 8.15% |
| 24 months | 5.75% | 13.90% |
| 30 months | 5.95% | 19.85% |

Soon after the city's negotiator discovered his error he contacted officials of the Police Officers Association and the Lieutenants and Sergeants

Association, whose collective bargaining agreement was negotiated at the same time and contained an identical provision. The Lieutenants and Sergeants Association voluntarily agreed to amend its contract. However, the city's negotiator was unable to reach agreement with the Police Officers Association, which indicated that it would pursue a grievance to secure the benefits of the collective bargaining agreement's COLA. Plaintiff responded with this suit for its reformation.

There was no dispute at trial concerning the meaning of the collective bargaining agreement's COLA. It was not alleged that the language was ambiguous, and the lower court was not called upon to construe the agreement. Plaintiff sought reformation on the ground of mutual mistake. Success in this action requires that the parties to an instrument execute it in the mutually mistaken belief that its terms are those of a valid prior agreement. See *Scott v Grow,* 301 Mich 226, 239–240; 3 NW2d 254; 258 (1942), 66 Am Jur 2d, Reformation of Instruments, § 19, pp 544–545, 76 CJS, Reformation of Instruments, § 28, pp 361–363.

Plaintiff's case consisted of evidence tending to show the terms of the agreement reached at the bargaining table, and the negotiators' understanding of the agreement. Among the proofs was the testimony of one Mr. Nussbaum, attorney for the Police Officers Association and their chief spokesman at the negotiations. Mr. Nussbaum corroborated the plaintiff's version of the agreement reached at the bargaining table, and testified that he did not recognize the stacking or compounding effect of the contract formula until it was called to his attention by the city's negotiator, approximately 20 months after the agreement was executed.

The trial court dismissed plaintiff's cause of action at the close of its proofs. The court found that rank and file ratification of the contract was a prerequisite to its validity, that there had been a ratification vote, and that the valid prior agreement required for reformation did not come into existence until this vote took place. Therefore, reasoned the court, it was only the COLA provision as presented to the union membership to which the collective bargaining agreement could be reformed. Mr. Nussbaum, as chief negotiator and attorney for the Police Officers Association, had appeared at what the court found was the ratification meeting. However, when plaintiff asked Mr. Nussbaum what explanation of the COLA provision had been given the association members, the court sustained an objection on the basis of the attorney-client privilege. The court subsequently found that there was no evidence as to what the union members ratified. Therefore, the court concluded, plaintiff had failed to show the substance of the prior agreement, and hence had failed to show that defendant mistakenly believed that the instrument executed conformed to it.

Plaintiff raises several issues on appeal. We find the controlling questions to be whether a failure to establish the terms of the agreement as presented to the individual employees at the time of the alleged ratification vote would warrant dismissal of plaintiff's claim, and, if so, whether plaintiff failed to make a prima facie showing on this point. The underlying issue is whether Mr. Nussbaum, the chief negotiator, had the authority required to conclude a "valid prior agreement", without ratification by the union members.

At the outset we note that defendant withdrew its allegations that the COLA provision, as it

eventually appeared in the executed contract, was read to and approved by the rank and file, and that they were told that this would become the collective bargaining agreement. Defendant also withdrew its allegation that this written agreement, as opposed to any oral agreement, was ratified by the union membership. Defendant did not withdraw its allegation that plaintiff knew that any agreement was conditioned on ratification by the employees. However, plaintiff denied this allegation. It was therefore an issue at trial whether ratification was required.

We search the record in vain for credible evidence that ratification was indeed required. Nothing in the collective bargaining agreement so provides. Nor does defendant's constitution (including by-laws) require membership ratification of collective bargaining agreements. Defendant's president did testify that in his opinion ratification was necessary. However, he admitted that his opinion was based entirely upon a provision of the Association's constitution which plainly required ratification only for amendments to that constitution.

Mr. Nussbaum, the union's negotiator, testified that he had told the city's negotiator that *Association approval* was required for all agreements reached at the bargaining table. However, Mr. Nussbaum admitted uncertainty as to whether he had said that it was essential to get *ratification,* as opposed, for example, to final approval by union officers. Mr. Nussbaum did not testify that ratification was mandatory, nor did he state the source of his opinion that agreements were conditioned upon union approval.

The only other evidence arguably on point was Mr. Nussbaum's testimony that he was informed on the morning after a meeting held on April 24,

1972, at which he had addressed the employees on the substance of the April 12th agreement, that there had been a ratification vote. The statement was obviously hearsay, and was accompanied by Mr. Nussbaum's admission that he did not know for a fact if a ratification meeting took place on that date. Moreover, the mere fact that a ratification vote was held would not imply that such was required to give force to the union's agreement. In sum, we regard this isolated hearsay statement as an insufficient basis for concluding that a ratification vote was required.

The public employment relations act (PERA), under which this agreement was made, accords broad authority to the designated representative. That act provides, in pertinent parts of sections 11 and 15, respectively, as follows:

"Representatives designated or selected for purposes of collective bargaining by the majority of the public employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the public employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment, and shall be so recognized by the public employer." MCLA 423.211; MSA 17.455(11).

"A public employer shall bargain collectively with the representatives of its employees as defined in section 11 and is authorized to make and enter into collective bargaining agreements with such representatives." MCLA 423.215; MSA 17.455(15).

The Michigan Supreme Court has stated that Federal cases decided under the National Labor Relations Act may be looked to for guidance in construing comparable provisions of the PERA. *Michigan Employment Relations Commission v Reeths-Puffer School Dist,* 391 Mich 253, 260; 215

NW2d 672, 675 (1975). In those cases cited to this Court we find support for a broad construction of the designated representative's authority. *See, e.g., Ford Motor Co v Huffman,* 345 US 330, 336–339; 73 S Ct 681, 685–687; 97 L Ed 1048, 1057–1058 (1953), *National Labor Relations Board v Darlington Veneer Co,* 236 F2d 85, 88–89 (CA 4, 1956), *Crenshaw v Allied Chemical Corp,* 387 F Supp 594, 598–599 (ED Va, 1975). In *Darlington Veneer, supra,* the court, construing the section of the Labor Management Relations Act which parallels PERA § 11 (quoted *supra),* stated:

"The statute [29 USCA § 159] contemplates the making of agreements by representatives of the employees, not by the employees themselves, giving 'statutory approval to the philosophy of bargaining as worked out in the labor movement in the United States.'" 236 F2d at 89. (Footnote and citations omitted.)

*Crenshaw, supra,* also expansively defines the designated representative's authority:

"Congress has given unions wide authority and great discretion to reconcile the competing interests of the employees whom they represent so that they might speak with one voice when they confront management at the bargaining table. * * * Congressional validation of collective action, however, necessarily involves extinguishing many of the contract and economic rights belonging to union members and, instead, vesting the power to act in their behalf with their chosen representative, the union." 387 F Supp at 598–599.

Reservation of a right of ratification may be typical, as the trial court here seemed to assume. See *Lear Siegler, Inc v International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW),* 419 F2d 534,

535 (CA 6, 1969). However, we find nothing in the text of the PERA which suggests that it is required. We do not doubt that defendant could have reserved the right of ratification by agreement with plaintiff. See *Wald v Nassau Chapter Civil Service Employees Ass'n, Inc,* 72 Misc 2d 723, 724; 340 NYS2d 451, 453 (1973). However, no such agreement appears of record. Thus, neither statute, nor contract, nor defendant's constitution and by-laws support its allegation that ratification was required. Nor is there any testimony that the membership had otherwise limited its bargaining representative's power. *Cf. Houchens Market of Elizabethtown, Inc v National Labor Relations Board,* 375 F2d 208, 212 (CA 6, 1967).

On the other hand, there was a substantial basis for concluding that the agreement was not conditioned on ratification by the employees. We find the PERA's broad grant of authority to the representative very significant. Moreover, there was testimony here that the POA's agents undertook to make changes in the pension agreement and longevity pay provisions of the agreement *after* the purported ratification meeting without ever going back to the rank and file for further ratification. Certainly this evidence supports an inference that the union was free to close a binding bargain without first getting member approval. We conclude that on the record before the lower court it was error to find that ratification was required.

Although this conclusion is sufficient to resolve the issue before us, we add some additional observations to guide the lower court on remand.

Even if ratification is not required, it is still essential to plaintiff's case to establish the authority of Mr. Nussbaum, or of Mr. Nussbaum and the other union negotiators, to bind the union by

agreement reached at the bargaining table. Such authority is strongly suggested by Mr. Nussbaum's position as chief negotiator and union attorney, considered with regard to general principles of agency law. See 3 Am Jur 2d, Agency, § 84, p 488; 7 Am Jur 2d, Attorneys at Law, § 100, p 111. The suggestion of such authority is further strengthened by Mr. Nussbaum's initiatives to alter the agreement with respect to the pension and longevity pay provisions. From the record before us it appears that these actions were undertaken without consultation with other union figures. On the other hand, Mr. Nussbaum's statement that union approval was required cuts against a finding of such authority. But see *National Labor Relations Board v Industrial Wire Products Corp,* 455 F2d 673, 678–679 (CA 9, 1972).

Defendant's motion for involuntary dismissal was made without prejudice to defendant's right to offer evidence. GCR 1963, 504.2. On remand defendant may wish to present evidence that a ratification meeting was required and did occur.

However, on the record as it presently exists, even if we were convinced that ratification was indeed required and that a ratification vote occurred, it would appear to us that plaintiff had carried its burden of showing that the agreement as ratified was that hammered out at the April 12th bargaining session. There was testimony before the lower court tending to establish the following.

The April 24th, 1972, meeting, at which the ratification vote supposedly took place, was attended by Mr. Nussbaum. It was he, Mr. Nussbaum, who explained the agreement to the members. The collective bargaining agreement's COLA provision did not take final form until *after* the purported ratification meeting. Mr. Nussbaum, as

previously noted, testified that he thought, nearly two years into the contract, that its COLA provision comported with the April 12th agreement. Thus, if the union members were given to understand anything of this agreement, we must infer that it was the same understanding as was shared by the city's negotiator and Mr. Nussbaum, *i.e.,* the substance of the April 12th agreement reached between the negotiators.[1]

Defendant may choose to controvert this evidence by producing proof that the agreement as presented to the union members on April 24th was in accord with the COLA incorporated in the executed collective bargaining agreement. However, presentation of such evidence will waive the attorney-client privilege protecting communications to the membership regarding the substance of this agreement. Defendant shall not be allowed to prevail by insisting that it made an agreement

---

[1] Mr. Nussbaum testified that, when first presented with the formula, he had some misgivings about it. However, his subsequent testimony made clear that those misgivings were not based on any insight into the formula's compounding effect:

"Q *[Mr. Donaldson, Attorney for Plaintiff]* Do you mean to go on the record in this Court to the effect that you recognized that the formula contained a flaw or error or a doubling up effect and that you withheld that information from Mr. Brennan at that time.

"A Mr. Donaldson, I'm a hard bargainer but I'm no thief. If I anticipated this kind of effect, that contract would never had *[sic]* been signed, if I could help it.

"Q You didn't recognize the flaw in the formula at that point in time, did you?

"A No, I knew from—

"Q (Interposing) You wouldn't have taken advantage of it had you recognized it, would you?

*     *     *

"THE WITNESS: No, I wouldn't.

"Q (By Mr. Donaldson) Is it correct to state that the first time you recognized the flaw or the doubling up effect was after it was called to your attention by Mr. Brennan on or about March 13th, 1974?

"A Yes."

with plaintiff other than that reached at the bargaining table, but that the terms of that agreement are privileged.

Reversed. No costs.