DONAJKOWSKI v ALPENA POWER COMPANY

Docket No. 108468. Argued January 20, 1999 (Calendar No. 2). Decided
June 30, 1999.

Local 286, Utility Workers of America, brought an action in the
Alpena Circuit Court on behalf of Christina Donajkowski and other
female union members against the Alpena Power Company, alleg-
ing sex discrimination in violation of the Civil Rights Act. The
union subsequently was dismissed as a plaintiff, and Alpena Power
filed a third-party complaint, seeking contribution from the union
in the event the defendant was found liable to the plaintiffs. The
court, Joseph P. Swallow, J., allowed the third-party complaint,
over the union's protest, and eventually granted summary disposi-
tion for the defendant. The Court of Appeals, NEFF, P.J., and
FITZGERALD, J. (C. A. NELSON, J., dissenting), reversed the grant of
summary disposition, but affirmed the decision allowing the third-
party complaint against the union. 219 Mich App 441 (1996)
(Docket No. 183475). The union appeals.

In an opinion by Justice YOUNG, joined by Chief Justice WEAVER,
and Justices BRICKLEY, TAYLOR, and CORRIGAN, the Supreme Court
held:

Under the Michigan contribution statute, MCL 600.2925a; MSA
27A.2925(1), an employer being sued for sex discrimination based
upon the operation of a collective bargaining agreement may seek
contribution from a union that was a party to the agreement.

1. While Michigan common law prohibits an intentional
tortfeasor from seeking contribution, the Michigan contribution
statute, MCL 600.2925a; MSA 27A.2925(1), does not include such a
limitation or prohibition. Thus, contribution may be had between
tortfeasors without regard to the intentional character of their acts,
and, on the basis of its plain and unambiguous terms, the statute,
with specific exceptions, authorizes an intentional tortfeasor to
seek contribution.

2. The Civil Rights Act did not impliedly repeal the contribution
statute. A repeal may be inferred when it is clear that a subsequent
legislative act conflicts with a prior act, or when a subsequent act
of the Legislature clearly is intended to occupy the entire field cov-
ered by a prior enactment. In this case, the union failed to meet the
burden of establishing either of these criteria. Nothing in the Civil

Rights Act directly conflicts with the contribution statute, nor is there any evidence that the Civil Rights Act was intended to address, much less completely occupy, the field of contribution.

Affirmed.

Justice KELLY, joined by Justice CAVANAGH, dissenting, stated that the defendant employer may not seek contribution from the union for intentional sexual discrimination arising from a collective bargaining agreement provision.

The majority has erroneously read into § 2925a a right to contribution among wilful tortfeasors, despite the fact that the right is lacking from the manifest intent of the Legislature as derived from the words of the act itself. Rather, the language of the statute indicates that the Legislature intended only to permit contribution among negligent, or nonintentional, tortfeasors.

*The Fishman Group* (by *Steven J. Fishman, Paul D. Kramer, Donald H. Scharg* and *Thomas A. Pinch*) for plaintiffs.

*Sachs, Waldman, O'Hare, Helveston, Bogas & McIntosh, P.C.* (by *Mary Ellen Gurewitz, John R. Runyan,* and *Marshall J. Widick*), for third-party defendant-appellant, Local 286, Utility Workers of America, AFL-CIO.

Amicus Curiae:

*Jordan Rossen,* General Counsel, and *Georgi-Ann Oshagan,* Associate General Counsel, for International Union, UAW.

YOUNG, J. We granted leave in this case to address the scope of the Michigan contribution statute, MCL 600.2925a; MSA 27A.2925(1). Specifically, we are presented with the question whether an employer being sued for sex discrimination based upon the terms of a collective bargaining agreement may seek contribution from a union that was a party to that

labor agreement. We hold that Michigan law permits
an employer to bring such a contribution action.

I

FACTS AND PROCEDURAL HISTORY

Plaintiff Christina Donajkowski began working for
defendant Alpena Power Company in 1985. In 1986,
she became a meter reader, and the first female mem-
ber of Local 286, Utility Workers of America, AFL-
CIO.[1] Plaintiff Beth McDonald joined Donajkowski as
a meter reader and member of the union in 1989.
Later that year, Alpena Power and the union negoti-
ated a three-year collective bargaining agreement that
created a new classification entitled "general
labor/meter reader." Donajkowski and McDonald
were placed in this new classification. Pursuant to the
agreement, the wage range for the new classification
was between $7.50 and $10.50 an hour.

Because the members of the new classification,
which included two men, had been making more than
$10.50 an hour before the agreement, the agreement
froze their wages. The two men in the general
labor/meter reader classification moved into other
classifications before the agreement took effect, leav-
ing only plaintiffs Donajkowski and McDonald in the
general labor/meter reader classification. The agree-
ment provided pay increases for the other union clas-
sifications. There were no women in these other
classifications.

---

[1] The union consisted of approximately twenty-three members at the
time this suit was originally filed.

Alpena Power hired plaintiff Deedra Duranceau into the general labor/meter reader classification in 1990. Duranceau started at $7.50 an hour and received regular increases until she reached the $10.50 maximum.

When Alpena Power and the union could not agree on a new contract in 1992, Alpena Power instituted the terms of its last best offer and union members worked without a contract. Defendant's last best offer maintained the basic structure of the 1989 collective bargaining agreement insofar as it maintained the maximum wage for the general labor/meter reader classification while providing increases for the other classifications. The effect of these terms was to freeze the wages of the three female union members—all of whom were in the general labor/meter reader classification—while granting increases for the remaining classifications, which were populated by male union members. However, nonunion female employees also received pay increases during this period.

In 1993, plaintiffs and the union filed suit against Alpena Power alleging sex discrimination in violation of the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, and the Equal Pay Act, 29 USC 206(d)(1). After the union was dismissed as a party-plaintiff pursuant to stipulation, defendant filed a third-party complaint seeking contribution from the union in the event defendant was found liable to plaintiffs. Defendant argued that the union should be jointly liable for any discrimination stemming from the collective bargaining agreement because that agreement was the result of negotiation between defendant and the union. The trial court allowed the

third-party complaint, over the union's protest.[2] Eventually, the trial court also granted summary disposition for defendant on plaintiffs' claims. Plaintiffs and the union then appealed. The Court of Appeals reversed the grant of summary disposition, but affirmed the decision allowing the third-party complaint against the union.[3] Alpena Power and the union both sought leave to appeal. We denied Alpena Power's application, but granted leave to the union.[4] Thus, the merits of the underlying claims are not at issue here, and we only concern ourselves with the propriety of defendant's third-party complaint against the union.

II

THE PARTIES' ARGUMENTS

The parties correctly assert that a claim for sex discrimination sounds in tort. See *Stimson v Michigan Bell Telephone Co*, 77 Mich App 361, 366, n 3; 258 NW2d 227 (1977). Our Legislature has declared that there is a right of contribution among joint tortfeasors:

> Except as otherwise provided in this act, when 2 or more persons become jointly or severally liable in tort for the same injury to a person or property or for the same wrongful death, there is a right of contribution among them even

---

[2] When this suit was originally filed, plaintiffs were represented by the attorney for the union. At the trial court's urging, the union attorney withdrew as counsel for plaintiffs after the third-party complaint was filed.

[3] 219 Mich App 441, 444-446; 556 NW2d 876 (1996).

[4] 457 Mich 870 (1998).

though judgment has not been recovered against all or any of them. [MCL 600.2925a(1); MSA 27A.2925(1)(1).]

The defendant employer contends that, to the extent it is liable to plaintiffs for sex discrimination, the union is liable as a joint tortfeasor under the statute. For its part, the union contends: (1) an intentional tortfeasor may not seek contribution, and (2) the Civil Rights Act should be construed as prohibiting any attempt by an employer to seek contribution from a union.

As explained below, we are not persuaded by the union's arguments, and we conclude, as did the trial court and the Court of Appeals, that the plain language of the contribution statute permits defendant to pursue a third-party claim against the union.

III

STANDARD OF REVIEW

We review questions of statutory construction de novo. *McAuley v General Motors Corp*, 457 Mich 513, 518; 578 NW2d 282 (1998). In construing a statute, our purpose is to ascertain and to give effect to the Legislature's intent. *Reardon v Mental Health Dep't*, 430 Mich 398, 407; 424 NW2d 248 (1988). If the language of a statute is clear and unambiguous, the plain meaning of the statute reflects the legislative intent and judicial construction is not permitted. *Tryc v Michigan Veterans' Facility*, 451 Mich 129, 135; 545 NW2d 642 (1996). We must give the words of a statute their

plain and ordinary meaning. *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27; 528 NW2d 681 (1995).

IV

ANALYSIS

A. THE CONTRIBUTION STATUTE

At common law, courts have often drawn distinctions between intentional and nonintentional tortfeasors vis-à-vis their right to seek contribution.[5] Indeed, Michigan common law prohibits an intentional tortfeasor from seeking contribution.[6] However, our Legislature has not seen fit to maintain that common-law distinction in our statutory scheme. Thus, unlike a number of other states, our contribution statute does not include any limitation or prohibition concerning intentional tortfeasors.[7] Whatever the pol-

---

[5] See *Fidelity & Deposit Co of Maryland v Newman*, 109 Mich App 620; 311 NW2d 821 (1981). See also 18 Am Jur 2d, Contribution, § 47, pp 53-54, and cases cited therein.

[6] *Moyses v Spartan Asphalt Paving Co*, 383 Mich 314, 334; 174 NW2d 797 (1970), overruled in part on other grounds in *Hapner v Rolf Brauchli, Inc*, 404 Mich 160, 182, n 5; 273 NW2d 822 (1978); *Fidelity & Deposit Co*, n 5 *supra*.

[7] The Michigan contribution statute is based on the Uniform Contribution Among Tortfeasors Act. Until 1974, the Michigan contribution act was apparently based on the 1939 version of the uniform act. See the history appended to 1948 CL 691.561. In 1974, the Michigan Legislature amended the statute, and adopted most of the provisions of the 1955 revision of the uniform act. The 1955 revision of the uniform act provides, in part:

(a) Except as otherwise provided in this Act, where two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them.

\*     \*     \*

icy arguments for or against such a rule,[8] we conclude that the Legislature has unambiguously provided that contribution may be had between tortfeasors without regard to the intentional character of their acts, and we are not at liberty to ignore the plain language of the statute.

The union relies upon a number of cases addressing the distinction between intentional and nonintentional tortfeasors. Most of those cases dealt with the common law. See *Moyses v Spartan Asphalt Paving Co*, 383 Mich 314; 174 NW2d 797 (1970), overruled in

---

(c) There is no right of contribution in favor of any tortfeasor who has *intentionally* [wilfully or wantonly] caused or contributed to the injury or wrongful death. [12 ULA 194 (emphasis added).]

A number of other states have adopted subdivision 1(c) in some form. See Ariz Rev Stat Ann 12-2501(C); Cal Civ Proc Code 875(d); Colo Rev Stat Ann 13-50.5-102(3); Fla Stat Ann 768.31(c); Nev Rev Stat 17.255; NC Gen Stat 1B-1(c); ND Cent Code 32-38-01(3); Ohio Rev Code Ann 2307.32(A); Okla Stat Ann, tit 12, § 832(C); SC Code Ann 15-38-20(C); Tenn Code Ann 29-11-102(c). At least two states have adopted different language, which presumably has a similar effect. See Ky Rev Stat Ann 412.030 and Va Code 8.01-34, which both state: "Contribution among wrongdoers may be enforced when the wrong results from negligence and involves no moral turpitude."

Thus, it is particularly noteworthy that the Michigan Legislature declined to adopt the subsection of the uniform act prohibiting an intentional tortfeasor from seeking contribution.

[8] We note that there are persuasive policy arguments supporting both sides of the question whether intentional tortfeasors should be able to seek contribution. Cf. *Northwest Airlines v Transport Workers Union of America*, 451 US 77, 88; 101 S Ct 1571; 67 L Ed 2d 750 (1981) ("Recognition of the right [to contribution] reflects the view that when two or more persons share responsibility for a wrong, it is inequitable to require one to pay the entire cost of reparation, and *it is sound policy to deter all wrongdoers by reducing the likelihood that any will entirely escape liability*" [emphasis added]) with *Bedard v Greene*, 409 A2d 676, 677-678 (Me, 1979) (the court recognized twin rationales for denying an intentional wrongdoer the right to contribution: the "clean hands" notion that "the law will not lend its aid to him who founds his cause of action upon an immoral or illegal act" [citation omitted]; and a deterrence goal: "the deterrent effect of tort liability would be weakened by allowing intentional wrongdoers to spread their liability to others").

part on other grounds in *Hapner v Rolf Brauchli, Inc*,
404 Mich 160, 182, n 5; 273 NW2d 822 (1978); *Cald-
well v Fox*, 394 Mich 401; 231 NW2d 46 (1975); *Fidel-
ity & Deposit Co of Maryland v Newman*, 109 Mich
App 620; 311 NW2d 821 (1981); *Johnson v Bundy*,
129 Mich App 393; 342 NW2d 567 (1983). In addition,
the facts in *Moyses, Caldwell*, and *Johnson* involved
negligence, breach of warranty, or products liability,
rather than intentional torts. Thus, to the extent that
any of these cases suggest that the contribution stat-
ute does not apply to intentional tortfeasors, they do
so only in dicta.

The only Michigan case that directly addresses the
statutory contribution rule is *Hunt v Chrysler*, 68
Mich App 744, 747-750; 244 NW2d 16 (1976), where
the Court concluded that an intentional tortfeasor
*may* bring an action for contribution under the stat-
ute. The union does cite one federal case, *In re Air
Crash at Detroit Metropolitan Airport*, 791 F Supp
1204, 1226 (ED Mich, 1992), wherein the federal dis-
trict court stated that "Michigan courts have ruled
that an intentional tortfeasor may not recover contri-
bution under the [contribution statute]." However the
court in *In re Air Crash* was mistaken; no Michigan
court has so held. The court in *In re Air Crash* con-
fused the Michigan common-law rule with that estab-
lished in the Michigan contribution statute, and essen-
tially relied on dicta from the cases it cited for this
proposition.[9] We conclude that, on the basis of its
plain and unambiguous terms, the Michigan contribu-

---

[9] The court relied on *Johnson, supra*, and *Salim v LaGuire*, 138 Mich
App 334; 361 NW2d 9 (1984). As noted above, *Johnson* did not involve an
intentional tort, and did not directly address this issue. Similarly, *Salim*
involved a negligence action, and only reached this issue in dicta. *Id.* at
335, 341.

tion statute, with specific exceptions,[10] authorizes an intentional tortfeasor to seek contribution.

### B. THE CIVIL RIGHTS ACT

The union also argues that the Civil Rights Act should be read to preclude an action for contribution brought by an employer against a union. The union does not point to any language in the act requiring or even hinting at such a result. Instead, the union relies on a case involving title VII, the federal counterpart to our Civil Rights Act. In *Northwest Airlines v Transport Workers Union of America*, 451 US 77, 90-95; 101 S Ct 1571; 67 L Ed 2d 750 (1981), the United States Supreme Court found that title VII did not provide an employer charged with a civil rights violation with a right to contribution from the union. The Court also concluded that, in the absence of congressional authorization, the Court was without authority to grant an employer such a right. *Id.* at 95-98.

While we often examine federal law in construing our Civil Rights Act, Michigan law is not analogous to federal law on this point. Under federal law, there is no statutory right to contribution, whereas in Michigan there is. Under these circumstances, *Northwest Airlines* is wholly inapplicable.[11]

---

[10] The statute specifically states that it does not apply in certain cases, such as those involving breaches of trust or other fiduciary obligations. MCL 600.2925a(8); MSA 27A.2925(1)(8); *Fidelity & Deposit Co, supra* at 623-626. Those exceptions do not apply here.

[11] Indeed, to the extent it suggests that a right to contribution might be available under state law, *id.* at 97, n 38, the reasoning in *Northwest Airlines* actually favors defendant.

The union additionally argues that the Civil Rights Act "impliedly repealed" the contribution statute. We find no merit in this argument.

We will only infer the repeal of a statute in narrow circumstances, and there is a strong presumption against such a finding. *House Speaker v State Administrative Bd*, 441 Mich 547, 563; 495 NW2d 539 (1993). A repeal may be inferred: (1) when it is clear that a subsequent legislative act conflicts with a prior act, or (2) when a subsequent act of the Legislature clearly is intended to occupy the entire field covered by a prior enactment. *Id.* Here, the union has failed to meet the heavy burden of establishing either of these criteria. Nothing in the Civil Rights Act directly conflicts with the contribution statute, nor is there any evidence that the Civil Rights Act was intended to address, much less completely occupy, the field of contribution. Under these circumstances, there is absolutely no basis for finding that the contribution statute has been impliedly repealed by the Civil Rights Act.

### C. PUBLIC POLICY

Finally, the union argues that public policy precludes an employer from seeking contribution from a union. We are unaware of, and the union has failed to identify the source of, any free-standing public policy that would operate to protect a wrongdoer from paying for its own discriminatory actions. Indeed, the articulated legislative policy of this state is that discrimination in employment on the basis of sex is forbidden. MCL 37.2202; MSA 3.548(202). If, as defendant has alleged in its contribution action, the union was complicit with defendant in discriminating, then they

are both wrongdoers and neither should be able to escape liability.

V

RESPONSE TO THE DISSENT

We find it easier to consolidate our response to the dissent, rather than providing it piecemeal.

The dissent has taken on the leviathan burden of justifying the position that plaintiffs' union may escape liability for its alleged role in fostering employment discrimination in the workplace. Stripped to its essentials, the dissent would hold that a union may conspire to discriminate on the basis of sex, and, when called to account at the bar of justice for its role in that conspiracy by the others charged, escape liability. Thus, the dissent would grant this union a blanket immunity from contribution that is unavailable to any other person, corporation, or entity in our state.

To make the matter plain, the legal question posed by this case is simple: Where a plaintiff has alleged that the terms of a collective bargaining agreement negotiated by her employer *and* her union discriminate against her on the basis of her gender, may the union escape liability for its asserted complicity in that act of discrimination? As set forth above, we hold that the union is accountable for its role in any alleged discrimination in the workplace and is subject to a contribution action as a joint tortfeasor. By contrast, the dissent concludes that a union alleged to be

complicit in workplace sex discrimination is nonetheless immune from contribution.[12]

The dissent's answer to this charge is that the plaintiffs are free to file a discrimination suit against their union. The dissent fails to point out that this is true in all cases involving joint tortfeasors; a plaintiff is always free to file suit against any or all tortfeasors. Yet, our Legislature has seen fit to allow contribution among joint tortfeasors, even when the plaintiff chooses not to sue all of them.[13] The dissent's recognition that plaintiffs are free to sue their union also seems to contradict the dissent's primary argument, that plaintiffs here (and, perhaps, plaintiffs in general) need the assistance of their union in order to maintain a discrimination suit. We find it odd that the dissent urges union litigation support as its primary policy rationale for avoiding contribution liability. While assisting union members with litigation may be a laudatory union object, surely it is secondary to the union's core duty to negotiate and administer labor agreements. The irony here is that plaintiffs contend that their union negotiated pay provisions that were

---

[12] We express no opinion regarding whether the union's conduct was, in fact, discriminatory. The merits of such a claim are to be resolved in the contribution action. The only issue posed in this case is whether the union is amenable to a contribution action under our contribution statute because of its participation in negotiating terms of a collective bargaining agreement that plaintiff has alleged to be sexually discriminatory in her action against her employer.

[13] We note that this Court has already dismissed the dissent's argument. See *Caldwell, supra* at 420 ("[P]laintiff's caprice in choosing to join or not to join third-party defendants is not determinant of third-party plaintiffs' right to contribution"). Indeed, we believe that allowing a plaintiff to determine the allocation of liability unilaterally is antithetical to the purpose of a contribution statute. See *Markey v Skog*, 129 NJ Super 192, 201; 322 A2d 513 (1974) (The policy of a contribution statute "seeks to prevent plaintiffs, by their unilateral actions, from electing where to place the burden of a common fault").

discriminatory. We are not prepared to overlook a union's alleged discrimination in performing this core duty in order to further one of the union's secondary functions, and we do not believe that the dissent's rationale for granting this union a "free pass" can withstand scrutiny.

### A. THE DISSENT'S STATUTORY CONSTRUCTION ARGUMENT

The linchpin of the dissent's argument that a union charged with discrimination in the workplace may not be held accountable for such discrimination is its "construction" of the contribution statute. The dissent acknowledges that the contribution statute, according to its plain terms, allows contribution among "joint tortfeasors." The dissent further recognizes that the statute does not distinguish between joint tortfeasors whose conduct injures by intentional design and those whose conduct injures by negligence. Notwithstanding the absence of any supporting language in the statute, the dissent finds a legislative intent to distinguish between the two kinds of joint tortfeasors.

The dissent relies in part on one of our longstanding rules of statutory construction—that statutes enacted in derogation of the common law are narrowly construed. After properly stating the rule, however, the dissent immediately misapplies it.[14]

---

[14] We note that this venerable rule acts as a guide to the courts in construing statutes, not as a limitation on the Legislature. In other words, the fact that a statute enacted in derogation of the common law must be construed narrowly is not to say that the Legislature is precluded from changing the common law. Quite the contrary; our Legislature is always free to change the common law. Indeed, it has express constitutional authority to do so. Const 1963, art 3, § 7; *Myers v Genesee Co Auditor*, 375 Mich 1, 7; 133 NW2d 190 (1965) (O'HARA, J.).

As we previously noted, in enacting the contribution statute, our Legislature chose to abandon all of the restrictions that the common law

Relying upon *Moyses, supra,* the dissent asserts that the term "joint tortfeasor" was a term of art defined in our common law to refer only to *negligent* tortfeasors. Even if this were true, it is simply irrelevant: four years after *Moyses* was decided, our Legislature amended the contribution statute to remove any reference to the phrase "joint tortfeasors."[15] Moreover, to the extent the Court in *Moyses* addressed a right of contribution among intentional tortfeasors, it did so only in dicta; the issue before the Court there was whether several, but not joint, tortfeasors could seek contribution. There was simply no allegation that any of the defendants in *Moyses* were intentional tortfeasors. Yet the dissent appears prepared to treat *Moyses* as binding authority on this point.

Despite evidence of a legislative intent to eliminate any distinction between negligent and intentional tortfeasors, the dissent attempts to revive the contrary dicta from *Moyses* by pointing out that our Legislature has not seen fit to overrule that dicta. Aside from the obvious fallacy in this argument (why would this or any other court expect the Legislature to react to dicta?), we note that the Legislature only amended

---

imposed on contribution actions among joint tortfeasors. As the dissent recognizes, the contribution statute at issue here was based upon the model contribution act that itself retained the prohibition recognized in our common law after *Moyses*—that *intentional* tortfeasors could not maintain a contribution action.

The fact that our Legislature did not include this restriction in adopting its version of the model contribution act is significant to any good-faith effort to give meaning to the Legislature's intent. *Gibson v Neelis,* 227 Mich App 187, 194; 575 NW2d 313 (1997) ("[D]eviation from the language in a model act is presumed to be deliberate"). The deletion of the model act's provision restricting contribution among intentional tortfeasors is clearly inconsistent with an intent to maintain any distinction between intentional and negligent tortfeasors.

[15] 1974 PA 318.

the contribution statute to bring it into conformity with the Uniform Contribution Among Tortfeasors Act in 1974,[16] four years after *Moyses* was decided. It was at this point that the Legislature apparently made the decision not to adopt the model act's provision prohibiting contribution among intentional tortfeasors. Thus, if we accept the dissent's argument that silence can be an indication of legislative intent (which, as made clear below, we do not), the Legislature, by its decision in 1974 not to adopt the intentional tortfeasor provision of the model act, has already "overruled" *Moyses* on this point.[17]

In response to the dissent's legislative acquiescence argument, we must take this opportunity to observe that legislative acquiescence is an exceedingly poor indicator of legislative intent. Justice TAYLOR took great pains to point this out last term in *Rogers v Detroit*, 457 Mich 125, 163-166; 579 NW2d 840 (1998), and his remarks regarding the majority opinion in that case apply equally to the dissent here:

> [The majority's legislative acquiescence argument] is remarkable indeed and is perhaps what former Harvard University Law School Professor Thomas Reed Powell meant when he said in discussing legislative acquiescence arguments of this type:
>
> " '[C]ongress has a wonderful power that only judges and lawyers know about. Congress has a power to keep

---

[16] 1974 PA 318.

[17] The dissent asserts that this Court "continued to recognize the distinction between intentional and nonintentional tortfeasors in *Downie v Kent Products, Inc*, 420 Mich 197, 217; 362 NW2d 605 (1984)." *Post* at 269, n 5. However, the dissent fails to point out that *Downie* did not actually address this distinction, and that the portion of *Downie* emphasized in the dissent's block quotation is merely dicta. In *Downie*, just as in *Moyses*, there was no allegation that any of the defendants were intentional tortfeasors.

silent. . . . Of course when congress keeps silent, it takes
an expert to know what it means. But the judges are
experts. They say that congress by keeping silent some-
times means that it is keeping silent and sometimes means
that it is speaking.' " [*Report to the Attorney General, Using
and Misusing Legislative History: A Re-Evaluation of the
Status of Legislative History in Statutory Interpretation*,
U S Dep't of Justice, Office of Legal Policy, January 5, 1989,
p 110, n 475, citing Powell, *The Still Small Voice of the
Commerce Clause*, in 3 Selected Essays on Constitutional
Law 931, 932 (Ass'n of American Law Schools 1938),
quoted in Tribe, *Toward a syntax of the unsaid: Constru-
ing the sounds of congressional and constitutional silence*,
57 Ind L J 515, 522 (1982).]

I believe that the majority's legislative factual history argu-
ment . . . is, as Justice Scalia so aptly said of similar legis-
lative history arguments, "frail substitute[] for bicameral
vote upon the text of a law and its presentment to the
[executive]." *Thompson v Thompson*, 484 US 174, 192; 108 S
Ct 513; 98 L Ed 2d 512 (1988). In fact, if such "history" tells
us anything, its meaning eludes me. At the very most, it is a
"history" that allows the reader, with equal plausibility, to
pose a conclusion of his own that differs from that of the
majority.[2]

---

[2] Commentators have noted that one can posit myriad reasons
explaining the Legislature's failure to correct an erroneous judicial
decision, including:

("Complete disinterest [sic]"; "Belief that other measures have a
stronger claim on the limited time and energy of the body"; "Belief
that the bill is sound in principle but politically inexpedient to be
connected with"; "Unwillingness to have the bill's sponsors get
credit for its enactment"; "Belief that the bill is sound in principle
but defective in material particulars"; "Tentative approval, but
belief that action should be withheld until the problem can be
attacked on a broader front"; "Indecision, with or without one or
another of the foregoing attitudes also"; "Belief that the matter
should be left to be handled by the normal processes of judicial
development of decisional law, including the overruling of out-
standing decisions to the extent that the sound growth of the law
requires"; "Positive approval of existing law as expressed in out-
standing decisions of the Supreme Court"; "Ditto of the courts of
appeals' decisions also"; "Ditto also of district court decisions";
"Ditto also of one or more varieties of outstanding administrative

determinations"; "Etc., etc., etc., etc., etc.") [*Report to the Attorney General, Using and Misusing Legislative History: A Re-Evaluation of the Status of Legislative History in Statutory Interpretation,* U S Dep't of Justice, Office of Legal Policy, January 5, 1989, p 113, n 485, citing Hart & Sacks, *The Legal Process: Basic Problems in the Making and Application of Law,* pp 1395-1396 (tent ed, 1958).]

---

The majority's analysis poses yet a further problem, for it should not be assumed that the Legislature even agrees it has a duty to correct interpretations by the courts that it considers erroneous. As Judge STEPHEN MARKMAN, of our Court of Appeals, insightfully observed on this topic in one of his scholarly writings, "no sensible theory of statutory interpretation would require Congress to devote a substantial portion of its time to extinguishing judicial forest fires." Markman, *On interpretation and non-interpretation,* 3 Benchmark 219, 226, n 60 (1987).

As is clear, in my view, this case is an excellent example of the misuse of the doctrine of legislative acquiescence. Indeed, whether it can ever be appropriate to use legislative acquiescence has in the past been the subject of heated debate on this Court. In *Autio v Proksch Construction Co,* 377 Mich 517, 527; 141 NW2d 81 (1966), Justice SOURIS described it as "a pernicious evil designed to relieve a court of its duty of self-correction" and indicated that it "has been examined and rejected by this Court before, but its current resurrection demands we perform the task once more lest our silence be construed as signifying its unanswerable validity." In the course of his discussion, Justice SOURIS quoted language from *Van Dorpel v Haven-Busch Co,* 350 Mich 135, 145-146; 85 NW2d 97 (1957), which is worthy of consideration:

"Now this beguiling doctrine of legislative assent by silence possesses a certain undeniable logic and charm. Nor are we oblivious to the flattery implicit therein; double flattery, in fact; flattery both to the profound learning and wisdom of the particular supreme court which has spoken, and flattery to a presumably alert and eagerly responsive State legislature. One pictures the legislators of our various States periodically clamoring and elbowing each other in their zeal to get at the pearls of wisdom embalmed in the

latest decisions and advance sheets of their respective supreme courts—and thenceforth indicating their unbounded approval by a vast and permanent silence.

"Yet there are several dark shadows in this picture. For one, it suggests a legislative passion for reading and heeding the decisions of our supreme courts which we suspect may be scarcely borne out by the facts. For another, pushed too far such a doctrine suggests the interesting proposition that it is the legislatures which have now become the ultimate courts of last resort in our various States; that if they delay long enough to correct our errors those errors thus become both respectable and immutably frozen; and, finally, the larger and more dismal corollary that if enough people persist long enough in ignoring an injustice it thereby becomes just."

If it has not been clear in our previous decisions, we wish to make it clear now: "legislative acquiescence" is a highly disfavored doctrine of statutory construction; sound principles of statutory construction require that Michigan courts determine the Legislature's intent from its *words*, not from its silence.

Finally, we note that the dissent would use legislative acquiescence to bind the Legislature not only to our past holdings, but also to mere dicta. We think it presumptuous to bind the Legislature to that which we do not even bind ourselves. *Hett v Duffy*, 346 Mich 456, 461; 78 NW2d 284 (1956), overruled on other grounds in *Weller v Mancha (On Rehearing)*, 353 Mich 189, 194; 91 NW2d 352 (1958).[18] Heaven forfend if the Legislature is obligated to respond to every

---

[18] The Court in *Hett, supra* at 461, put it quite well: "Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand are, however illuminating, but obiter dicta and lack the force of an adjudication."

excursus of the third branch or else be deemed
bound thereby.

The language of the contribution statute plainly
allows contribution among joint tortfeasors of all
stripes. We are unconvinced by the dissent's effort to
look beyond the words of the statute and find a dis-
tinction between intentional and negligent tortfeasors
that is otherwise unapparent.

### B. THE DISSENT'S VIEWS ON THE CIVIL RIGHTS ACT

Again we agree with the generic proposition pro-
pounded by the dissent that Michigan courts fre-
quently look to the federal law arising under title VII
for guidance in construing our own Civil Rights Act.
*Koester v City of Novi*, 458 Mich 1, 11-12; 580 NW2d
835 (1998).

However, we disagree that the *Northwest Airlines*
decision provides aid to the union's attempt to avoid
contribution liability for discrimination in which the
union participated. As stated by the Supreme Court in
*Northwest*, title VII contained no provision touching
upon contribution and there was no federal statute
authorizing contribution. In the absence of any fed-
eral statute supporting a contribution action, the
Supreme Court declined to impose one, believing this
to be a legislative prerogative of the Congress. This is
precisely the opposite of our situation; Michigan's
Legislature *has* exercised its prerogative by creating a
general right of contribution among joint tortfeasors.
This being the case, *Northwest* is entirely inapposite
and provides no support for the dissent's position.

### C. THE DISSENT'S PUBLIC POLICY ARGUMENT

As stated previously, we find no basis for a "free floating" public policy argument that the union may escape liability for its alleged participation in gender discrimination. Without a single citation of authority, the dissent suggests a public policy based upon the following:

> A union is designed to advance the interests of its members. . . . By permitting an employer to seek contribution from [it], the majority creates a conflict of interest, placing a union and its members in an adversarial posture . . . [and] denying [employees] access to legal representation from their unions. [*Post* at 275-276.]

We find no inherent contradiction between the union's duty to its members and its obligation to avoid participating in discriminatory practices prohibited by the Civil Rights Act.[19] That is, there is no conflict between one statutory policy that says a union's duty is to its members, and another statutory policy that prohibits a union from conspiring to injure a union member. In fact, these propositions are in total harmony. If there is a conflict of interest in this case between the plaintiff and her union, it arises because our Civil Rights Act precludes her union from participating in unlawful employment discrimination. To the extent that the union here may have participated in negotiating the terms of a collective bargaining agreement that resulted in gender discrimination, the dissent has failed to articulate any sound public policy that justifies insulating the union from liability for

---

[19] Indeed, a union has no authority to bargain away union members' rights secured by a civil rights act. *Alexander v Gardner-Denver Co*, 415 US 36, 51-52; 94 S Ct 1011; 39 L Ed 2d 147 (1974).

such misconduct. Indeed, we believe that holding the union accountable for such misconduct via a contribution action will actually support the fundamental goal of our Civil Rights Act to eradicate discriminatory employment practices.

Surely, all would agree that the goal of the Civil Rights Act is broadly to prevent discrimination in the workplace. But the dissent apparently believes that the union here should enjoy some special protected status unavailable to any other person or entity. The dissent simply fails to adequately explain the reason for and the source of a public policy that would provide a free pass to this union (or any other entity) alleged to have participated in such discrimination. In sum, given the choice between vindicating Michigan's civil rights laws and protecting this union, the dissent has chosen the latter.

VI

CONCLUSION

In light of the plain language of the contribution statute, we find no evidence of a legislative intent to preclude an employer from seeking contribution from a union in this context. Accordingly, we affirm the decision of the Court of Appeals.

WEAVER, C.J., and BRICKLEY, TAYLOR, and CORRIGAN, JJ., concurred with YOUNG, J.

KELLY, J. (*dissenting*). The majority has erred by holding that an employer, sued for discrimination under a collective bargaining agreement, may seek contribution from the union that negotiated the agree-

ment. The majority's response unfortunately misrepresents my position, inter alia, by stating, "the dissent would hold that a union may conspire to discriminate on the basis of sex, and, when called to account at the bar of justice for its role in that conspiracy by the others charged, escape liability." *Ante* at 254. It goes almost without saying that plaintiffs are entitled to file a discrimination claim against their union.[1]

The effect of the majority opinion is to deprive union members of union legal representation under the guise of vindicating their Michigan civil rights. Although the majority purports to advance the laudable goal of eradicating discriminatory employment practices, it undermines this goal by placing employees and their unions in an adversarial position. In addition, it prohibits employees from acquiring legal representation from their union, thereby increasing the costs of litigation.

## STANDARD OF REVIEW

This case involves statutory interpretation, which is a question of law subject to de novo review. *Oakland*

---

[1] The majority opinion observes that "a plaintiff is always free to file suit against any or all tortfeasors." *Ante* at 255. Despite the absence of any supporting statutory language, it then conclusively states, "our Legislature has seen fit to allow contribution among joint tortfeasors, even when the plaintiff chooses not to sue all of them." *Id.* However, the majority fails to recognize the distinction between joint (negligent) and intentional tortfeasors. *Moyses v Spartan Asphalt Paving Co*, 383 Mich 314, 329; 174 NW2d 797 (1970). The weakness of the majority opinion's holding is evidenced by its reliance on its own unsupported conclusions.

The majority also asserts that "this Court has already dismissed the dissent's argument." *Ante* at 255, n 13. Ironically, the majority then cites a Michigan case recognizing the distinction between intentional and nonintentional tortfeasors, *Caldwell v Fox*, 394 Mich 401, 416; 231 NW2d 46 (1975), as well as a New Jersey case, *Markey v Skog*, 129 NJ Super 192; 322 A2d 513 (1974).

*Co Bd of Co Rd Comm'rs v Michigan Property & Casualty Guaranty Ass'n*, 456 Mich 590, 610; 575 NW2d 751 (1998). The primary purpose of statutory interpretation is to ascertain and effectuate legislative intent. *Frankenmuth Mut Ins Co v Marlette Homes, Inc*, 456 Mich 511, 515; 573 NW2d 611 (1998).

When promulgating new laws, the Legislature is presumed to be familiar with the rules of statutory construction and existing laws on the same subject. *Malcolm v East Detroit*, 437 Mich 132, 139; 468 NW2d 479 (1991); *People v Tracy*, 186 Mich App 171, 177; 463 NW2d 457 (1990). Therefore, the language of a statute should be read in light of previously established rules of common law. *Nummer v Dep't of Treasury*, 448 Mich 534, 544; 533 NW2d 250 (1995).

Any word or phrase that has a unique meaning at common law should be interpreted as having the same meaning when used in a statute dealing with the same subject. *Pulver v Dundee Cement Co*, 445 Mich 68, 75; 515 NW2d 728 (1994). Because well-settled common-law principles must not be abolished by implication, an ambiguous statute that contravenes common law should be interpreted to make the least change in the common law. *Marquis v Hartford Accident & Indemnity (After Remand)*, 444 Mich 638, 652-653; 513 NW2d 799 (1994).

## THE CONTRIBUTION STATUTE

At common law, as a general rule, contribution was not recoverable between joint wrongdoers or tortfeasors. *O'Dowd v General Motors Corp*, 419 Mich 597, 603; 358 NW2d 553 (1984). The Legislature partially abrogated this common-law bar by adopting

predecessors to MCL 600.2925a; MSA 27A.2925(1),[2] and this Court abolished the remnants of it in *Moyses v Spartan Asphalt Paving Co*, 383 Mich 314, 329; 174 NW2d 797 (1970).[3] *O'Dowd, supra* at 603.

In *Moyses*, this Court recognized that the phrase "joint tortfeasor" had a unique meaning at common law. *Id.*, 329-331. It explained:

> In general ["(t)he legal phrase 'joint tortfeasor' "] was, and still is, that where two (or more) persons owe to another the same duty and by their common *neglect* of that

---

[2] The initial predecessor to § 2925a provided:

It shall be lawful for all persons having a claim or cause of action against 2 or more joint tort-feasors to compound, settle with, and discharge, at any time prior to rendition of a judgment in said action, any and everyone or more of said joint tort-feasors for such sum as such person may deem fit, without impairing the right of such person or persons to demand and collect the balance of said claim or cause of action from the remaining joint tort-feasors, against whom such person, or persons, has such claim or cause of action, and not so released. [MCL 691.562; MSA 27.1683(2) (repealed).]

In 1961, § 2925(2) was amended to provide:

It shall be lawful for all persons having a claim or cause of action against 2 or more joint tort-feasors to compound, settle with, and discharge, at any time prior to rendition of a judgment in said action, any and every one or more of said joint tort-feasors for such sum as such person may deem fit, without impairing the right of such person or persons to demand and collect the balance of said claim or cause of action from the remaining joint tort-feasors, against whom such person, or persons, has such claim or cause of action, and not so released. [MCL 600.2925(2); MSA 27A.2925(2) (repealed).]

[3] Overruled in part on other grounds in *Caldwell*, n 1 *supra*. In *Moyses*, this Court noted that § 2925 fell short of its intended purpose of providing a right to "contribution between or among jointly liable or severally liable but not wilful tortfeasors." *Id.*, 327. As noted by the majority, subsequent cases have maintained the distinction between intentional and nonintentional tortfeasors. *Johnson v Bundy*, 129 Mich App 393, 400; 342 NW2d 567 (1983); *Fidelity & Deposit Co of Maryland v Newman*, 109 Mich App 620, 625-626; 311 NW2d 821 (1981).

duty such other is injured, the two (or more) have commit-
ted a joint tort and therefore are joint tortfeasors. [*Id.*, 329
(emphasis added).]

Although the majority attempts to circumvent this
unique meaning, it fails to provide support for the
assertion that "joint tortfeasor" did not acquire a
unique meaning. Moreover, *Moyses* rejected the
majority's conclusions by explicitly excepting wilful
or intentional wrongdoers.

Addressing whether joint tortfeasors are entitled to
seek contribution under then § 2925, we explained:

> Stimulated by the national advancement of principles set
> forth in the Uniform Contribution Among Tortfeasors Act
> [UCATA] . . . the tendency of other courts to provide by
> judicial action the right of contribution on behalf of all but
> intentional wrongdoers, and the compelling admonitions of
> modern writers like Prosser,[4] we have decided to overrule
> what is left of Michigan's common-law bar of contribution
> between or among "wrong-doers," *wilful or intentional
> wrongdoers excepted.* [*Id.*, 334 (emphasis added).]

The present version of § 2925a states the following
right of contribution among joint tortfeasors:

> Except as otherwise provided in this act, when 2 or more
> persons become jointly or severally liable in tort for the
> same injury to a person or property or for the same wrong-
> ful death, there is a right of contribution among them even

---

[4] Quoting Prosser, Torts (2d ed), § 46, this Court added:

"It seems quite clear that the rule denying contribution in favor
of negligent tortfeasors is in full retreat, and that in due course of
time the pressure of opinion will compel its abolition. As to wilful
wrongdoers, or those who are guilty of the more flagrant forms of
misconduct, there is no indication of any desire or tendency to
relax the original rule." [*Id.*, 335-336.]

though judgment has not been recovered against all or any of them. [MCL 600.2925a(1); MSA 27A.2925(1)(1).]

The majority correctly observes the absence of a right of contribution among wilful tortfeasors in this provision. Emphasizing that the Michigan contribution statute is based on the UCATA, the majority finds it "particularly noteworthy that the Michigan Legislature declined to adopt the subsection of the uniform act prohibiting an intentional tortfeasor from seeking contribution." *Ante* at 250, n 7.

However, the majority disregards the fact that the predecessor to § 2925a similarly failed to expressly prohibit intentional tortfeasors from seeking contribution. Despite the absence of such a prohibition, this Court interpreted both the common law and the predecessor to § 2925a to conclude that intentional tortfeasors were barred from seeking contribution. *Moyses, supra* at 334.[5] This is "particularly noteworthy" because the Michigan Legislature failed to expressly permit contribution among intentional tortfeasors when it enacted the present version of § 2925a.

---

[5] The majority aptly recognizes that the Legislature amended the contribution statute in 1974 to adopt "most of the provisions of the 1955 revision of the uniform act." *Ante* at 249, n 7. However, interpreting these revisions, this Court continued to recognize the distinction between intentional and nonintentional tortfeasors in *Downie v Kent Products, Inc*, 420 Mich 197, 217; 362 NW2d 605 (1984), explaining:

There is a substantive right to contribution on the part of a *nonintentional* tortfeasor who has paid more than his pro-rata share of the common liability. [*Id.*, citing MCL 600.2925a(1), (2); MSA 27A.2925(1)(1), (2) (emphasis added).]

Notwithstanding the 1974 amendments, this Court continued to limit contribution to nonintentional tortfeasors. *Id.*

Silence by the Legislature following judicial construction of a statute suggests consent to that construction. *Craig v Larson*, 432 Mich 346, 353; 439 NW2d 899 (1989). Rejecting this proposition, the majority recites a plethora of scholarly writings to support its proposition that " 'legislative acquiescence' is a highly disfavored doctrine of statutory construction . . . ." *Ante* at 258-261. These writings may provide interesting fodder for legal debate, but the better analysis relies on established precedent cited by courts of this state. I rely on *Wikman v City of Novi*, 413 Mich 617, 638; 322 NW2d 103 (1982), *Wehmeier v W E Wood Co*, 377 Mich 176, 191; 139 NW2d 733 (1966), *In re Clayton Estate*, 343 Mich 101, 106-107; 72 NW2d 1 (1955), *Baks v Moroun*, 227 Mich App 472, 489; 576 NW2d 413 (1998), *Glancy v Roseville*, 216 Mich App 390, 394; 549 NW2d 78 (1996), aff'd 457 Mich 580; 577 NW2d 897 (1998), and *Generou v Kalamazoo Regional Psychiatric Hosp*, 192 Mich App 295, 304; 480 NW2d 638 (1991).

The majority also cites *Autio v Proksch Construction Co*[6] for Justice SOURIS' views regarding legislative acquiescence. *Ante* at 260. Coincidentally, Justice BLACK's poignant response to those comments is equally applicable today:

In the resultant circumstances it is—for the time being—useless to write much more against what I look upon as a judicial disease; a disease which—if not quickly cured—is bound to destroy the only substance which sustains our judicial system. That substance is public confidence in the intellectually steadfast devotion of judges to law as it is written; distinguished from law judges want ordained. . . . The time has come for all lawyers and judges of Michigan

---

[6] 377 Mich 517, 527; 141 NW2d 81 (1966).

to resign themselves to this real, if temporal, usurpation of legislative power. Too, the minority seated here must philosophically accept the situation until our personnel is changed . . . .

*     *     *

At one time students and citizens, lay and professional, were taught that everyone is presumed to know the law, and hence is duty bound to act in accord therewith. But how may even skilled lawyers, and correspondingly skilled subordinate court judges, "know the law" when they are taught that the law in the books is not law at all, unless upon litigatory test a bare majority of this very ordinary Supreme Court happens to like it? [*Id.*, 540-542 (BLACK, J., dissenting).]

Regarding "legislative acquiescence," Justice BLACK added:

"[T]he doctrine of legislative reliance upon and acceptance of judicial interpretation has its value and its place. . . . In today's instance, unless we are to ignore a constantly employed axiom (that the legislature enacts with the Court's interpretational decisions in one hand as it writes and votes with the other), we have here most of the more or less conclusive reasons why the doctrine of legislative acceptance should be applied. When a legislature, confronted constantly with *unanimous* interpretations . . . , deliberately re-enacts without change such an interpreted statutory proviso, . . . it seems to me that any judge who fails to apply the mentioned doctrine wittingly or unwittingly violates the law." [*Id.*, 545-546 (citation omitted).]

Returning to the immediate case, the Legislature previously amended the statute in the wake of *Moyses*,[7] but chose not to expressly eliminate the dis-

---

[7] In *Moyses*, this Court explained that the contribution statute permitted contribution only among *joint* tortfeasors, not among *several* tortfeasors. *Id.* at 327. Referring to the common law, this Court held that

tinction between intentional and nonintentional tortfeasors. Hence, presumably, it ratified the distinction.

However, the majority curiously concludes that this absence supports a finding that "the Legislature has unambiguously provided that contribution may be had between tortfeasors without regard to the intentional character of their acts . . . ." *Ante* at 250. The majority has erroneously read into the statute a right to contribution among wilful tortfeasors. It has done so despite the fact that the right is lacking from the manifest intent of the Legislature as derived from the words of the act itself. *In re S R*, 229 Mich App 310, 314; 581 NW2d 291 (1998).

As previously discussed, the phrase "joint tortfeasor" has a unique meaning at common law, referring to two or more persons who have commonly neglected a duty to another. *Moyses, supra* at 329. A phrase that acquires a unique meaning at common law should be interpreted as having that same meaning when used in a statute dealing with the same subject. *Pulver, supra* at 75.

Given the Legislature's presumptive familiarity with rules of statutory interpretation,[8] the language of the statute indicates that the Legislature intended only to permit contribution among negligent, or nonintentional, tortfeasors. Had the Legislature intended to permit contribution among intentional tortfeasors, it

---

it permitted contribution among joint and several tortfeasors, but not among intentional tortfeasors. Following the release of *Moyses*, the Legislature amended the statute to permit liability among both joint and several tortfeasors. However, it chose not to amend the statute to provide for contribution among intentional tortfeasors, implicitly accepting this Court's conclusion.

[8] *Malcolm, supra* at 139.

.

would have so provided. Therefore, the majority has erred by interpreting § 2925a in a manner that contravenes common-law principles.

### THE CIVIL RIGHTS ACT

The language of the Michigan Civil Rights Act closely parallels language adopted by the Equal Employment Opportunity Commission, the agency vested by Congress to enforce title VII, defining sexual discrimination. *Radtke v Everett,* 442 Mich 368, 381; 501 NW2d 155 (1993). Although the majority criticizes the defendant union for relying on federal authority, this Court often turns to federal precedent for guidance in reaching a decision. *Id.,* 381-382; *Sumner v Goodyear Tire & Rubber Co,* 427 Mich 505, 525; 398 NW2d 368 (1986).

In *Northwest Airlines v Transport Workers Union of America,*[9] an employer paid male cabin attendants higher wages than its female attendants pursuant to a fixed-wage scheme contained in a collective bargaining agreement. As a result, the employer was held liable to its female employees for backpay, because its collectively bargained wage differentials violated the Equal Pay Act and title VII. *Id.,* 79-82. The employer then sought contribution from the unions that negotiated the collective bargaining agreement with it. *Id.,* 82.

Assuming that the unions bore significant responsibility for the discriminatory practices, the United States Supreme Court nevertheless concluded that the employer was not entitled to contribution for intentional discrimination. *Id.,* 90, 95. It explained

---

[9] 451 US 77, 80-81; 101 S Ct 1571; 67 L Ed 2d 750 (1981).

that neither title VII nor the Equal Pay Act provided employers with a right to contribution for intentional discrimination, and a general right to contribution did not exist under common law. *Id.*, 92-96. It also declined to create a right to contribution in addition to the statutory rights created in the Equal Pay Act and title VII. *Id.*, 98.

The majority here attempts to distinguish federal law by stating that there is no statutory right to contribution under federal law. Although Michigan law contains a statutory right to contribution, the majority disregards the absence of any provision permitting contribution for intentional tortfeasors.[10] Instead, the majority has created a right to contribution for intentional tortfeasors in addition to the statutory rights created by the Michigan Civil Rights Act, but attempts to attribute its creation to the Legislature. *Ante* at 262. Consequently, the majority erroneously asserts that "*Northwest* is entirely inapposite."

## PUBLIC POLICY

Finally, the majority finds itself "unaware of . . . any free-standing public policy" precluding an employer from seeking contribution from a union. *Ante* at 253. I believe that, as a matter of public pol-

---

[10] As noted by the majority, a federal district court has similarly concluded that intentional tortfeasors are not entitled to contribution under the Michigan contribution statute. *In re Air Crash at Detroit Metropolitan Airport*, 791 F Supp 1204 (ED Mich, 1992), aff'd 86 F3d 498 (CA 6, 1996). Although the majority accuses the district court of erroneously relying on dicta, the district court astutely recognized that the "right to contribution in Michigan is controlled entirely by statute, since there was no right to contribution at common law." *Id.*, 1234 (citation omitted). Contrary to the majority's assertion, the district court concluded that the employer was not entitled to contribution on the basis of the Michigan statutes and case law. *Id.*, 1235.

icy, precluding an employer from seeking contribution from a union protects the relationship between a union and its members. A union is designed to advance the interests of its members.[11] Although the majority emphasizes that "the union's core duty [is] to negotiate and administer labor agreements,"[12] it fails to explain how undermining this relationship advances this goal. By permitting an employer to seek contribution from the union, the majority creates a conflict of interest, placing a union and its members in an adversarial posture.

Union counsel presented persuasive comment regarding this policy during oral argument, asserting:

> [I]f in fact whenever there is alleged discrimination the union is going to find itself hauled into court defending itself at great expense and unable to assist its members, as it may very well want to do, that is not going to assist enforcement of the [Civil Rights] Act. It is going to deter enforcement of the act. The union here is not able to help its members. It is put at cross purposes with its members, and the employer ought not be able to create, at its will, . . . a barrier between the union and its members which precludes the union from giving the assistance it

---

[11] Our Court of Appeals has previously recognized that

"Congress has given unions wide authority and great discretion to reconcile the competing interests of the employees whom they represent so that they might speak with one voice when they confront management at the bargaining table. . . . Congressional validation of collective action, however, necessarily involves extinguishing many of the contract and economic rights belonging to union members and, instead, vesting the power to act in their behalf with their chosen representative, the union." [*Farmington Hills v Farmington Hills Police Officers Ass'n*, 79 Mich App 581, 590; 262 NW2d 866 (1977), quoting *Crenshaw v Allied Chemical Corp*, 387 F Supp 594, 598-599 (ED Va, 1975); see also *Barkley v Detroit*, 204 Mich App 194, 214; 514 NW2d 242 (1994) (TAYLOR, P.J., dissenting).]

[12] *Ante* at 255.

needs. If the union has, in fact, injured its members and the members are so convinced, they can sue it. But where the employer is able in this instance as it would be under this Court of Appeals decision, if the employer is able to separate the union from its members, and to put the employees who have sued, in this instance the three women, in a position where their union realizes that if the employees prevail the union is going to be probably bankrupt and possibly even—it's possible that if the union lost here and if the employer prevailed, that because it is a small and voluntary unincorporated association, as most unions are, most unions are unincorporated associations, it is possible that liability could be imposed upon the individual members. What I'm saying is that it does not serve the policy of [the Michigan Civil Rights Act] to permit an employer to do that. To permit an employer essentially to punish the bargaining unit, to drag the union into court when the employees have not chosen to do so, to put the union at cross-purposes with its members, and to essentially put the union members who have chosen to exercise their rights under [the Michigan Civil Rights Act], to put them in a position where their fellow union members see them, rightfully if this decision is upheld, as having endangered the union and possibly having endangered their co-workers. It allows the employer to punish the union, to punish the bargaining unit, to put it at great risk, because some employees have chosen to sue their employer. And I would suggest to you that that is very much counter to the public policy of [the Michigan Civil Rights Act]. And in fact it is extremely destructive to the policy of the act.

Also, permitting an employer to seek contribution from a union will discourage discrimination victims from pursuing claims by denying them access to legal representation from their unions. As demonstrated in the immediate case, union counsel originally represented plaintiffs, but was forced to withdraw after the defendant employer filed a motion to disqualify counsel on grounds of conflict of interest.

The majority asserts that my position will provide unions with a "free pass" to participate in sexual discrimination. It fails, however, to explain how my position would preclude plaintiffs from directly filing suit against its union for discriminatory conduct. Curiously, the majority attempts to disguise its interference with the employee-union relationship as "vindicating Michigan's civil rights laws." To the contrary, the majority undermines this goal by denying discrimination victims access to union legal representation.

Finally, liability from contribution claims could damage the financial stability of unions, reducing or eliminating their ability to represent and negotiate on behalf of their members. This result would clearly violate Michigan public policy.

CONCLUSION

Given that the majority's decision contradicts the manifest intent of the Legislature, federal law, and state public policy, I respectfully dissent. I would reverse the judgment of the Court of Appeals and conclude that the defendant employer may not seek contribution from the union for intentional sexual discrimination arising from a collective bargaining agreement provision.

CAVANAGH, J., concurred with KELLY, J.